DA 06-0757

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 203

MITCH TUTTLE,

Petitioner and Appellant,

v.

DEPARTMENT OF JUSTICE OF THE
STATE OF MONTANA, MONTANA
HIGHWAY PATROL,

Respondent and Respondent.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDV 2006-433
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Peter Michael Meloy, Robin A. Meguire, Meloy Law Firm, Helena, Montana

For Respondent:

Hon. Mike McGrath, Montana Attorney General, Jon E. Ellingson,
Assistant Attorney General, Helena, Montana

Submitted on Briefs:  July 25, 2007

Decided:  August 16, 2007

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Mitch Tuttle (Tuttle) appeals from the order of the First Judicial District Court, Lewis and Clark County, affirming the Montana Highway Patrol's (MHP's) decision to discharge Tuttle from duty as a highway patrol officer. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 Tuttle served as a Training and Research Section Supervisor for MHP from August 2001 through his suspension in January 2006. He supervised the training of highway patrol cadets at the Montana Law Enforcement Academy. Captain Butch Huseby (Captain Huseby) supervised Tuttle during the events at issue.

¶3 Tuttle traveled from Helena to Missoula in December of 2005 to conduct testing for MHP applicants. Trooper Tamara Winchell assisted Tuttle with the training in Missoula. She was stationed in Hamilton at the time. Tuttle submitted a request to Captain Huseby for reimbursement for his round trip from Helena to Missoula. The request indicated, to Captain Huseby's surprise, that Tuttle had stayed overnight at a hotel in Hamilton. Captain Huseby approved the request, but asked Tuttle why he would travel 86 miles out of his way to stay in Hamilton instead of driving back to Helena or staying overnight in Missoula. Tuttle responded that he had decided not to return to Helena after the testing in light of the icy roads and his own fatigue. Tuttle claimed that he stayed in Hamilton rather than Missoula to save money on lodging. Tuttle also mentioned that he had dinner with Trooper Winchell while in Hamilton. Captain Huseby investigated Tuttle's explanations and found that hotel rooms in Missoula cost roughly eight dollars per night more than rooms in Hamilton.

¶4     Captain Huseby believed that Tuttle's explanation regarding his trip to Hamilton lacked credibility. He decided to conduct a further investigation of Tuttle. Captain Huseby inquired specifically into another hotel room that Tuttle had charged to MHP on behalf of Trooper Kristine Welker (Trooper Welker).

¶5     Captain Huseby discovered that MHP had ordered Trooper Welker to travel to Helena for training in February of 2005. MHP directed Trooper Welker to stay at the Law Enforcement Academy. Tuttle intervened, however, and reserved a hotel room for Trooper Welker at the Hampton Inn. Tuttle claimed, for various reasons, that he could not grant Trooper Welker access to a room at the Law Enforcement Academy. Tuttle later admitted that he had a master key that would have allowed him to assist Trooper Welker in gaining access to a room at the Law Enforcement Academy.

¶6     Captain Huseby's investigation revealed that Tuttle had spent the evening with Trooper Welker after picking her up from the Hampton Inn. Tuttle learned over the course of the evening that Trooper Welker needed money for rent so she could move out of her husband's house. Tuttle offered to loan her the money. Tuttle returned to Trooper Welker's hotel room later that night with some of the promised money. Trooper Welker told Captain Huseby that Tuttle had tried to kiss her before he left her room.

¶7     Trooper Welker informed Captain Huseby that Tuttle later had threatened to end her career with MHP if she did not end her relationship with another trooper. Trooper Welker explained that Tuttle had warned her, when she was a cadet, that he had power over her initial placements and subsequent career.

¶8 Captain Huseby further learned that Tuttle had made similar representations to other cadets. Tuttle asked personal questions regarding the cadets' families, finances, and marriages. He indicated that he would use their answers to make his determination on their placement. Tuttle had no power to make decisions or recommendations regarding any cadet's placement. Tuttle also had represented falsely to female cadets that MHP had a policy of prohibiting placement of women in single station assignments or on Indian reservations.

¶9 Tuttle issued orders in July of 2005 for Trooper Welker and Tuttle to attend a "women in law enforcement" conference in Colorado. He sought to extend their stay past the end of the conference for "sightseeing." Tuttle represented to MHP, however, that he needed to extend the trip so that he could attend a banquet to be held on the evening of the last day of the conference. MHP discovered that the conference featured no such banquet after Trooper Welker showed her superiors a pamphlet explaining the conference dates. MHP denied Tuttle's request for an extra day in Colorado. Tuttle canceled his trip with Trooper Welker. Tuttle had by this time begun referring to Trooper Welker as "fat ass" while the two were on duty.

¶10 MHP charged Tuttle with multiple instances of misconduct in the course of his employment. MHP held a hearing on April 11-12, 2006. MHP determined that Tuttle had violated several of MHP's General Regulations on Obedience and Conduct. MHP found, specifically, that Tuttle had misappropriated state resources, committed sexual harassment, lied to investigators, and generally lacked the integrity and honesty necessary to serve in the MHP. MHP concluded that the "foregoing conduct constitutes cause for discharge of Sgt.

4

Tuttle from the Highway Patrol under Montana Code Annotated § 44-1-612." Section 44-1-612, MCA, lists various causes for suspension, demotion, or discharge of a highway patrol officer.

¶11　Tuttle appealed to the District Court.  He argued that the record failed to support MHP's order and that MHP had made errors of law.  The District Court concluded that substantial evidence supported MHP's findings of fact and that its decision to terminate Tuttle was correct.  Tuttle appeals.

## STANDARD OF REVIEW

¶12　We review MHP's administrative decision to determine whether it correctly interpreted the law and whether its findings are clearly erroneous.  *City of Billings Police Dept. v. Owen*, 2006 MT 16, ¶ 12, 331 Mont. 10, ¶ 12, 127 P.3d 1044, ¶ 12.

## DISCUSSION

¶13　Tuttle challenges only MHP's conclusions of law.  Tuttle does not challenge the findings of MHP on appeal.  He points out that the Montana Operations Manual on Progressive Discipline as found at Admin R. M. 2.21.65 (2005), governs MHP's disciplinary decisions.  He argues that, pursuant to these governing regulations, he should have been subjected to progressive discipline, instead of immediate termination.

¶14　Admin. R. M. 2.21.6509(2) (2005), provides that "[m]anagement shall, when appropriate, use progressive discipline."  The regulation continues to state that "the appropriateness of using progressive discipline in each case lies within the discretion of management."  The regulation states, however, that "[d]ischarge should not be an initial

5

disciplinary action except in severe cases or unsatisfactory performance or behavior that disrupts agency operations."

¶15   Tuttle argues that Admin. R. M. 2.21.6509(2) (2005), requires a single incident of egregious behavior.  He argues that MHP lumped together a number of minor incidents to support its conclusion to discharge him rather than subjecting him to some lesser form of discipline.

¶16   We disagree with Tuttle's characterization of his transgressions as minor.  MHP found that Tuttle had misappropriated state funds, lied to investigators and cadets, and sexually harassed at least one female trooper.  Any one of these offenses could have constituted grounds for dismissal.  We need not reach this question, however, as we fail to find any support for Tuttle's proposition that Admin. R. M. 2.21.6509(2) (2005), requires a single incident of severe behavior before MHP may initiate discharge proceedings.

¶17   We interpret administrative regulations first according to their plain language. *State v. Frickey*, 2006 MT 122, ¶ 19, 332 Mont. 255, ¶ 19, 136 P.3d 558, ¶ 19.  The plain language of the regulation—i.e., "severe cases or unsatisfactory performance or behavior"—could encompass a single incident or the pattern of misbehavior that MHP uncovered in this case. Tuttle cites no authority to the contrary.

¶18   We also find no support in this regulation's language for Tuttle's argument that he should receive some lesser discipline in light of the fact that MHP failed to document "Tuttle's minor misbehaviors as they occurred."  We will not require MHP to turn a blind eye to the combined severity of Tuttle's transgressions merely because MHP discovered Tuttle's various misbehaviors through the course of a single investigation.  We conclude that MHP

6

correctly determined that Tuttle's combined behavior provided sufficient grounds for his termination. *City of Billings Police Dept.*, ¶ 12.

¶19 Tuttle next challenges the MHP's legal conclusion that Tuttle sexually harassed Trooper Welker. MHP's General Regulations forbid unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when such conduct has the purpose of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment. MHP found that Tuttle misrepresented to Trooper Welker that he had power over her career. He threatened to end her career if she did not end her relationship with another trooper. He referred to Trooper Welker as "fat ass" multiple times while on duty. He made sexual advances towards Trooper Welker while she was in Helena for official training. These findings sufficiently support MHP's conclusion that Tuttle committed verbal conduct of a sexual nature for the purpose of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment. *City of Billings Police Dept.*, ¶ 12.

¶20 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART

7